Nora Chaib against Geo Group number 15-1614. And we'll hear from Mr. Darst. No audience. Go ahead, Mr. Darst. I'm not very popular, Judge. No, I'll listen very carefully. Thank you. May it please the court. In this discrimination case, the employer, Geo Group, Inc., led the district court to ignore the following evidence, which was in favor of the non-moving party, the employee, Nora Chaib. And this evidence was pretty striking. There were five prior complaints of discrimination against Lt. Davis, the harasser, before Chaib complained. Number two, Geo wrote two written reprimands against Lt. Davis involving discrimination before Chaib complained, but Geo did not discipline Davis when Chaib complained. Geo had a policy of not taking disciplinary action unless there was confession to all or part of the charge, in which case, for instance, Lt. Davis admitted a couple small items. He said that he called Officer Olemjambedi, Alphabet, and he admitted that he wadded up a complaint form from another, or from an inmate. And only in those cases would Geo, as a policy in practice, take action against the harasser, or Geo required a third party to witness the harassment, the harassing statement, or the harassment, which often does not occur, of course, because harassment occurs or harassers take that kind of action when there's nobody looking, usually. Geo also had a policy of not telling investigators about the prior complaints against the harasser, which would have, in and of themselves, corroborated the complaints of Chaib. So even though there were five prior complaints of discrimination, when Chaib's complaint was investigated one time by Geo, Geo did not tell that investigator about the five prior complaints or the two reprimands, prior reprimands of Davis. Geo led the district court to also ignore the failure of Geo to investigate other complaints of discrimination. They only investigated one of the complaints of discrimination of Chaib and took no action because Davis had not admitted to it, and there was no third party present when he made the statements of, you're stupid, you're a stupid foreigner, you stabbed me in the fucking back or effing back, she testified, and those kinds of statements. Geo led the district court to ignore Geo's destruction of the electronic evidence. It was pretty dramatic in this case, and I apologize to the court for using this language, but I feel that I must because it's so strong. After she had complained and Geo took no action against Davis, then someone entered Chaib's office, her assistant safety manager's office, and wrote on her computer, in the middle of the simplex fire extinguisher instructions that were on her computer, the words, all niggers remain on your bunks or you will be shot. And then said, sharpshooters on the rough, and then continued on with the simplex statement about our fire detectors. Ms. Chaib complained about that to Geo, and Geo did not investigate that. In fact, Geo took the pretty terrible action of destroying the evidence. They destroyed the paper copy that she gave to Geo. Then they went to the computer and destroyed the electronic data that was on the computer. Instead of locking down the computer, finding out when this was put on, the date, the time, finding out who had access to the computer, interviewing those people, seeing who had alibis and who didn't, they did none of that. And then later, they came back and said, well, that's not evidence because she doesn't know who did this. Well, of course she doesn't know who did this. That's the case with all anonymous actions. For instance, when people slash tires, that's harassment. You don't know exactly who did it. When people write on the bathroom walls racial slurs, you don't know exactly who did it, unless you investigate. And then even when you investigate and you find out that you can't determine exactly who did it, you issue a general warning about this and have extra vigilance. Geo led the district court to ignore the destruction of evidence, ignore the lack of investigation, and then blamed Shaiv instead of blaming Geo and said, she doesn't know who did it. Geo led the district court to ignore the importance of the evidence of the criminal assault. Let me, if I may interrupt here. The way you're phrasing your argument is that Geo led the district court to ignore certain evidence. And I gather that that's an allusion to your argument that the district court didn't require Geo to follow its local rule that requires the presentation of the facts in the light most favorable to the nonmoving party. Yes, and also the case law from the Supreme Court to that effect. Okay. Now, I guess my question is this. I understand well that the court has to view the evidence in the light most favorable to the nonmoving party, but it seems to me entirely unrealistic to think that somehow the moving party is required to, according to some standard, present its case in the light most favorable to its opponent. Well, I would... The obligation on the court, not the moving party. I would submit to you, Judge, that this is the burden of all moving parties. For instance, we're all familiar with the motion to dismiss, and the motion to dismiss must assume the facts well pleaded as true. Now, if the motion doesn't do that, you have to say right off, well, we can't grant that motion. I'm sorry. You're challenging facts here that are well pleaded. We're not going to consider this motion. Somehow, and I have great sympathy for the court, somehow the practice morphed into the practice that you described, where it was just a free-for-all, where one party would describe their side and another party would describe their side. You couldn't match up the facts. When you tried to match up the facts, you had to restate the chronology, and it became a voluminous paper. The court has stated that several courts, including the Supreme Court and Totten, have stated, Totten versus Cotton, that case said that the court cannot ignore the facts. The Malin case in this court said that the parties cannot ignore the facts. Then we have the recent assistance from the Rules Committee on Rule 1, which added that the parties must follow the rules. Then, to make an emphasis, the committee said, this is not a new rule. We're just emphasizing this. The parties have to follow the rules. Recently, in the last week, we have the Chief Justice emphasizing the same thing, saying the parties have to follow the rules and cannot be obstreperous, cannot be obstructionist, and that's the only way we're going to have an efficient judicial system. Otherwise, we end up with a free-for-all that you and I have seen too often. When we identify these facts, these glaring facts, destruction of evidence, for instance, that are not stated, you have to say, I would submit to you, you have to say, this is not a proper motion for summary judgment. We can't grant it. We can't tolerate it. Otherwise, we're just in a free-for-all. Well, let me take you right to what I think was the rationale of the court, which is that Lieutenant Davis sounds like a perfectly unpleasant human being. I agree. But he was not the decision-maker on the termination. The district court also ignored his involvement in the termination, especially after he blocked Ms. Shaib from doing her job in the control room, inspecting it to see what was there, if there were fire hazard-like heaters, things like that in the control room. Would not let her in. And then the superintendent backed him up instead of backing up the person who was discriminated against. But that isn't why she was terminated, was it? No. Right after that, the control room released a door on a windy day that hit her in the head and gave her a physical injury that sent her to the doctor and to the hospital. And Lieutenant Davis was in charge of the shift on that day and wrote the injury report. Then when she came back from the hospital with a correctional officer, he told her to drive home. Geo then terminated her for driving. But not for driving home, but for driving later when she was on medical leave. Boy, when Geo tells you to drive, he didn't say, you can drive home but not anyplace else. He said, yeah, go ahead. And the correctional officer who was with her at the doctor's office didn't receive any instruction not to drive, not for her not to drive home. She didn't receive any instruction not to drive home. She never received any instructions not to drive. Her work instruction to the, or the work restriction from the doctor to Geo was that she would not drive or use heavy machinery. That was a work restriction. Not that she would never drive to the store to get food or gasoline or to see friends or anything like that. So then after he tells her to drive home, he then runs and tells the HR assistant manager. There was no HR manager there. They didn't fill that position, which is another deficiency. He tells the assistant manager who was there that she had a complaint against a prior employer. Are you referring to the email? Yes. And what's the evidence that that included Davis? Is there anything else besides that email? Oh, it says the lieutenant. And the lieutenant who was in charge of the shift at the time of the injury was Davis. The lieutenant who sent her home was Davis. We've asked for the staffing plan to see how many lieutenants there are, and Geo has refused to give us that. And Davis is the only lieutenant or only employee of the defendant who worked at the previous facility. So he was the one who had the information and who would know. So that's an inference you'd like to draw. We don't know of any. On page 19 of your reply brief, you went well beyond what are obviously the fundamental disagreements between the parties about what facts and evidence are material to this case and said in general terms that the defense had misrepresented the record. In what respect? Not a disagreement about what's relevant or the sequence in which it was presented. May I get that? Please. All right. That refers to the previous sections where Geo had implied that, or perhaps even said that Shive was told not to drive. Shive was never told not to drive by anyone. Anything else? Well, I referred back to the facts. Well, what I'm trying to understand, though, look, there's an obvious difference, and courts are not going to try to police parties saying which facts are relevant. That's not a workable rule. You're going to have those disagreements. But if you think there's been a misrepresentation of the record, I'd like to know what it is. Well, that's an important misrepresentation right there, saying that she was told that she could not drive. She was never told she couldn't drive. She said that to the superintendent. She told the doctor that she was driving because she had no choice. And there was never any document to her stating that she shouldn't drive. There was never a statement to her saying that she shouldn't drive. Geo never told her she shouldn't drive. Instead, Geo, in order to make a pretext, after finding out she had an EEO complaint against the prior employer, went out and spent thousands of dollars proving that she was driving, and they never told her she was not supposed to drive. They just tried to do that in order to make a pretext to terminate her. And there were three emails discussing the lieutenant's involvement in that, and there was no evidence that there was any lieutenant that had worked with her before other than Davis, or any other employee who had worked before other than Davis, pinpointing him as the culprit for that. Then the last evidence was that when a subsequent employer asked, or a prospective employer asked this employer, Geo, about Shaib, the important facts that they gave to that prospective employer were, number one, she filed a complaint against her previous employer, and number two, she filed a complaint against Geo. Is that in our record? Yes, it is. And that is the last, I believe it's the last email in the appendix. Thank you. Thank you. May I save some time? We'll see. All right. May it please the court, there is absolutely no evidence in the record that the decision-maker, Superintendent Birch, did not honestly believe that Ms. Shaib had violated her medical restrictions or that she had misrepresented her condition to her doctors. There is also no dispute in the record that she was, for some reason, terminated on account of being a member of any protected class or any protected activity. The evidence is undisputed that Ms. Shaib saw three different treating physicians a total of five times, March 6th, 8th, 12th, 14th, and 20th. In each of those medical reports, each of those medical reports contained the specific restriction, do not drive, do not operate machinery. Now, Mr. Darst is correct. There is nothing in the record, nothing in the doctor's reports where the doctor records that the doctor told Ms. Shaib she was not to drive. There is nothing in the record that suggests GEO Group told Ms. Shaib she was not to drive. The only evidence in the record is the doctor's specific instructions after five different visits, all of which unanimously and uniformly say do not drive. The focus is not what Ms. Shaib thought or Ms. Shaib did in that respect. It is what was the honest belief of Superintendent Birch, and the record is uncontested as to what he saw and what he knew. There is also no- And that restriction then, the medical restriction was communicated to the supervisor. Yes, GEO Group had those medical restrictions, had those medical records. That is correct. There is also no dispute that Ms. Shaib did, in fact, drive. There's no doubt that she was surveilled, that she drove to the tanning salon, to the Dollar General store, to the drug store, to the auto zone, to the park, all during the daylight hours, which, incidentally, the doctor's records again reflect she had said she had photophobia, that she couldn't be out. Indeed, when she went to the- was referred to a neurologist as the final visit on April 20th, and that neurologist had viewed the video, the surveillance videos, and she even to that neurologist represented she was in a dark room when the neurologist went in, she complained about the light, she said, all I can do is sit on the sofa all day. The neurologist expressed her opinion, never having met Ms. Shaib, never having known Ms. Shaib, that indeed she was misrepresenting her condition and thought she was malingering, and authorized her to go back to work. That is the undisputed evidence that was before the decision-maker. It is also important to note that the person who directed the surveillance to take place had never met Ms. Shaib, didn't know her national origin, indeed said her only knowledge of Ms. Shaib was observing her tag with her photo ID on it, which she thought she was white Caucasian. So there is no basis upon which the district court could have concluded, and it did not, that there was any discrimination on the basis of any protected class or any protected activity. To address several points raised in Mr. Dorff's argument, we strongly disagree that there has been any failure to, there is no different summary judgment standard applied by the district court, as Judge Peterson points out, and as the case law is clear, the issue of giving the inference to the plaintiff is, for example, in the Bondly incident, where Ms. Shaib says that there was a statement made about whether there was an African-American photo on the wall. Ms. Bondly strenuously denies she made that statement, but Ms. Shaib says she does. For purposes of summary judgment, we must accept that fact as true, that indeed Ms. Shaib says the statement was made, so we accept that as true. That doesn't mean we are obligated to use that to argue for summary judgment, or we could have ignored that fact entirely. There's nothing about the summary judgment that places that burden on the moving party. Indeed, the court has been very clear in its decisions that the burden is on that non-moving party to come forward with that evidence to dispute those things. On a factual matter, too, with respect to the incident at the control room, there is indeed no evidence in the record as to when any statement was on that computer, who placed it on the computer, that Lieutenant Davis had any involvement in that incident whatsoever. Indeed, there is no evidence in the record to suggest that comment, this was a Simplex Grinnell document, a form document. They are a vendor that supplies materials to GeoGroup. There is no evidence that that had not been in place for years, months, at another location. There is no evidence that it wasn't on there when this computer was put in place. Indeed, this was simply an office that Ms. Shaheed took over and was using. There is simply no evidence to suggest anything about that having been placed in effect by anyone at GeoGroup, and there's no inference that could be drawn from that. Well, it seems a stretch to think that a statement that incendiary could have endured for a long time without somebody speaking up about it. Well, Ms. Shaheed testified, and the only evidence in the record is that she had never opened that document until the day she saw it. So it's a document that related to, I think it was fire extinguishers. So there's no evidence that anybody had been in there and seen the document before and wouldn't have found that. This is a document, she went in, she found it there, she reports it, they removed it, end of discussion. There's nothing to link that to anybody at GeoGroup. There's nothing to link it that it was directed toward Ms. Shaheed in any way, shape, or form. The final point I would also note, as the court asked Mr. Darst, is that with respect to Lt. Davis, there are a lot of assumptions being made about Lt. Davis. The evidence is that on that first day of the incident, that was March 6th. First of all, that didn't happen right after the control room. That's more than a month later. The control room incident occurred on February 2nd. Yes, and the document was January and the accident was in March. On the day she was injured, she was sent back home. There's no evidence that Lt. Davis or anyone else at GeoGroup on that date had any knowledge or information about any restrictions placed upon her. The only evidence we have about Lt. Davis being involved in any way in that is that Ms. Shaheed says that the employee who drove her home from the medical facility, Ms. Shaheed says that that person says that Lt. Davis had said, when asked, yes, she could go home. Then she adds in her deposition, drive home. That's all the evidence we have on that topic. There's no evidence that he understood anything about her medical condition, knew anything about any medical restrictions, so that simply does not go to the ultimate point. With respect to those instructions being work restrictions, as counsel represented, that's not accurate because, indeed, she had been instructed she couldn't go back to work. Those couldn't be interpreted by her or anyone else as work restrictions. Indeed, if she didn't know anything about them, they wouldn't have applied anyway. Thus, while we're prepared to address any questions from the court, the bottom line is there is simply no evidence that the decision-maker made this decision for anything other than an honest belief that Ms. Shaheed had misrepresented her condition and that she had failed to follow her medical restrictions. Does the company have a policy of not acting on employee complaints without a confession or corroboration, and what does the record tell us about that? The only evidence in the record is Ms. Strong, who, as soon as Ms. Shaheed made a complaint, it is referred to the official department that investigates such complaints. There is no formal policy that says that we'll never take action. It's simply her saying and it testified that when she went there, for example, the Bondly incident or, for example, the Lieutenant Davis incident where the only allegation, again, in the record is that he had said she was a stupid foreigner, no reference to race or any other characteristic. When the investigator went to investigate, she had no evidence that anything had occurred other than what Ms. Shaheed said. Lieutenant Davis denied it. There was no objective evidence from any party. She had no basis to conclude either way and had to dismiss the complaint. Thank you. Mr. Doris, your time has expired. One extra minute for rebuttal. Thank you, Your Honor. The protected class is shown by the EEOC instruction that the defendant relies upon, which says that the employer must listen to the employee's self-identification of her protected class. She is self-identified as Northern African, which is completely accurate, and African American. That identification is self-identification, which controls. Even if you don't allow her to say she's African American, which would not be fair to her, that wide strip of Africa cannot be wiped off the map and say those people can't complain about discrimination. To the racist, the white racist, he doesn't care where in Africa they come from. How many white racists have you asked that question? Pardon me? How many white racists have you asked that question to come up with a statement they don't care? None, but no racist. The white racist here didn't say, you know, where in Africa were you and what was your… No, no, no, but conceivably not. The Egyptians, the Africans, the rest of them are frequently all white, all Caucasian. Frequently? Frequently. But this lady… Mostly. Well, this lady has very prominent characteristics of a Northern African, and the GEO employer said she looked white in a photo. She also has very African characteristics, and we can't say that those people cannot complain about discrimination. That's the worst discrimination in France that there is. The employer says there's no evidence of honest – to challenge the honest belief. Look at the decision maker's actions where the decision maker changed his reasoning and omitted her – omitted defense, and then… Thank you, Mr. Darst. Okay. Time has expired. The case is taken under advisement.